**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X

LOURDES LIZ,                                   :
                                               :        Civil Case No.:
                              Plaintiff,       :
                                               :
           -against-                           :        **COMPLAINT**
                                               :
FOUNDATION FOR A SMOKE-FREE                    :
WORLD, INC.                                    :        <u>**Jury Trial Demanded**</u>
                                               :
                              Defendant.       :
------------------------------------------------------------ X

Plaintiff Lourdes Liz ("Ms. Liz" or "Plaintiff"), by and through her attorneys, Wigdor

LLP, as and for her complaint against Defendant Foundation for a Smoke-Free World, Inc.

("Defendant" or the "Foundation"), hereby alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      This action arises out of the Foundation for a Smoke-Free World, Inc.'s unlawful

retaliation against Plaintiff Lourdes Liz, which culminated in her termination.  The Foundation,

over the course of more than a year, engaged in intimidation and retaliation against Ms. Liz in

response to her repeated and steadfast objections to and complaints based on her reasonable

belief that the Foundation, through its hand-in-glove coordination with companies seeking to

promote vaping among teenagers, was violating its legal requirements and obligations as a tax-

exempt, non-profit organization.

2.      The Foundation's violations, to which Ms. Liz objected, included engaging in

activities designed to increase the profits of and do the bidding of for-profit corporations in the

tobacco industry, namely Phillip Morris International ("PMI") and its former parent company,

Altria Group, Inc. ("Altria").  Altria is the world's largest producer and marketer of tobacco,

cigarettes, and related products, and PMI's current partner in marketing and sales of IQOS, a heated tobacco and vape product manufacturer, in the United States.

3.    The Foundation tries to portray itself as an independent organization attempting to reduce the consumption of products produced by Big Tobacco.  This, however, is a mere smoke screen, and the Foundation has become well known as a tool of PMI and Altria, used to peddle their products (particularly vaping products) and push their message from behind a facade of seemingly respectable, supposedly independent science and public health research and policy. See, e.g., Philip Morris Money is Funding Pro-Vaping Virus Spin, by Tiffany Kary, April 17, 2020, accessible at https://www.bloomberg.com/news/articles/2020-04-17/philip-morris-money-is-funding-pro-vaping-coronavirus-spin; 10 Takeaways from The Foundation for a Smoke-Free World's 2019 Tax Return, accessible at https://exposetobacco.org/wp content/uploads/FSFW_2019_Tax_Return.pdf.

4.    Ms. Liz had the courage to question the Foundation's improper communications with and heavy influence by PMI and Altria, and call it out as contrary to its mission as a non-profit that was supposedly seeking to foster a "smoke free world."  Ms. Liz reasonably believed that these links to tobacco corporations strongly called into question whether the Foundation was violating the Internal Revenue Code (the "IRC") and/or committing unlawful and fraudulent conduct by continuing to claim that it was an independent non-profit when in fact it was not. Indeed, the Foundation is largely funded by PMI, making it all the more important to maintain true objectivity and keep PMI and Altria at arm's length in any strategy and marketing discussions.  If the Foundation is instead a marketing arm for Big Tobacco, its non-profit status is bogus and it is improperly reaping financial and other benefits (e.g., marketing and an

appearance of independence and objectivity) of being classified as a tax-exempt entity pursuant to section 501(c)(3) of the IRC.

5.      In addition, Ms. Liz made legally protected complaints about the Foundation's efforts to promote the use and/or downplay the health risks of e-cigarettes by teenagers and adolescents (who are not legally old enough to use such products in New York and many other states).  The Foundation engaged in such activities under the pretext of "harm reduction," *i.e.*, purportedly pointing them towards "safer" alternatives to cigarette smoking.  The Foundation did this despite the highly addictive nature of and dangerous levels of nicotine and other harmful ingredients in these products.

6.      Ms. Liz was shocked by how the Foundation was doing the bidding of PMI and Altria (a very large investor in the e-cigarette industry, including in JUUL Labs, Inc. ("JUUL")), and was furthering PMI's goal of creating a new generation of tobacco/nicotine users.

7.      For instance, just weeks into her employment, Ms. Liz learned that the Foundation's President, Derek Yach, in conjunction with the advertising firm Ogilvy, proposed an advertising concept that used Instagram influencers and personalities who performed vaping and e-cigarette related tricks (such as blowing circular "vape" bubbles after inhaling from an e-cigarette) – an advertising idea clearly targeted at teenagers and adolescents that promoted a pro-vaping, and therefore pro-PMI and Altria, message that vaping was a healthier alternative to smoking cigarettes.

8.      Ms. Liz vehemently disagreed with the Foundation's obvious and egregious exploitation of its non-profit, tax-exempt status and engagement in activities that diverged from its stated purpose and mission, not to mention promotion of teenage and adolescent vaping which would have harmful effects on the public health.

9.      Further, in the summer of 2018, Ms. Liz complained about why the Foundation was sponsoring the Conrad Challenge, run by the Conrad Foundation, an organization that supports a children's STEM-based education initiative, in connection with smoke-free challenges in certain target markets.  This event sponsorship, which seemed to target teenagers and adolescents, also appeared misdirected based on the Foundation's mission.

10.      In particular, Ms. Liz was alarmed to learn that the Foundation planned to fly the United States-based Conrad Challenge contest winners to Catania, Italy to visit the Foundation's Centre of Excellence there, whose Founder and Director, Riccardo Polosa, had previously accepted a **€1 million grant from PMI to investigate PMI's heated tobacco products**.  It was clear to Ms. Liz that was yet another attempt by the Foundation to further align itself and its messaging with PMI by propagating a pro-vaping message aimed at teens under the thin pretext of a "harm reduction" discussion.

11.      Similarly, in late August 2018, Ms. Liz received an email from Mr. Yach, where he referenced a meeting he had with representatives from Altria in which Altria praised the Foundation's apparent efforts to downplay the harmfulness of nicotine and urged the Foundation's advertising agency, Ogilvy, to push these efforts further.

12.      Mr. Yach's email not only confirmed that he, the Foundation's President, was holding strategy sessions with the Big Tobacco industry, but that he was willing to take the tobacco industry's direction about the Foundation's own efforts, spending, and messaging, which was unquestionably violative of the Foundation's legal obligations as a 501(c)(3) tax-exempt organization.

13.      Then, in October 2018, Ms. Liz raised concerns when the Foundation directed her to attend a teen marketing conference, as well as a meeting with an organization called

DoSomething.org, whose purpose is to motivate youth to make positive social changes.  In particular, Ms. Liz was troubled by the fact that none of the Foundation's executives seemed to offer a rationale for why the Foundation should participate in these meetings, nor could they explain how attending would support the Foundation's stated goals and missions.

14.     Rather, it appeared that the goal of marketing and making the Foundation visible to teenagers was more in line with the interests of PMI and Altria in promoting their purportedly "less harmful" smoking products, such as e-cigarettes.

15.     Subsequently, in the fall of 2018, after Ms. Liz's manager departed the Foundation, Ms. Liz was passed over for a promotion into her former manager's role – a role that Ms. Liz was more than qualified to assume – in favor of an employee that was more junior to her and far less qualified and experienced, but who had not spoken out against the Foundation's questionable relationship with and activities *vis-à-vis* Big Tobacco corporations.  This was clearly an act of blatant retaliation against Ms. Liz for her repeated complaints about the Foundation's suspect conduct.

16.     Over the next year plus, Ms. Liz was subjected to a sustained campaign of further retaliation, which included being systematically stripped of her duties and responsibilities, and being issued baseless performance warning and write-ups in order to create a paper trail to justify further adverse employment actions.

17.     During this time, the Foundation made it clear that Ms. Liz was *persona non grata* for having complained, repeatedly, about its efforts to dupe the public and the Internal Revenue Service ("IRS") by acting as and claiming to be a non-profit, while promoting a pro-tobacco industry agenda and pushing a pro-vaping message at teens too young to even legally use the products, harming the public's health in the process.

18.     Then, in November 2019, Ms. Liz challenged the Foundation's plan to advocate for an "Under 18 – No Vaping" strategy (which was already the policy (and often the law) of most, if not all, 50 states) at an upcoming World Health Organization ("WHO") convention, and supported a "No Vaping Until 21" position instead.  Ms. Liz's views were quickly dismissed, and she was excluded from further discussions surrounding the Foundation's activities at this WHO convention as yet another act of blatant retaliation for objecting to the Foundation's concerted efforts to do the tobacco industry's bidding by downplaying the dangers of teenage vaping.

19.     Subsequently, in January 2020, Ms. Liz and Mr. Yach had a discussion about the Food and Drug Administration's ("FDA") policy on vaping, during which Mr. Yach, once again, despite Ms. Liz's entreaties, refused to take a strong stance against teen vaping (which would of course conflict with PMI's and Altria's interests).

20.     Weeks later, on February 27, 2020, the Foundation summarily terminated Ms. Liz's employment, clearly having given up on trying to force Ms. Liz out of the organization by marginalizing her and scaling back her role.  The Foundation finally did what it thought was necessary to silence her once and for all and keep her from interfering in its improper activities in violation of its tax-exempt status and other related obligations.

21.     As a result of the Foundation's campaign of unlawful retaliation against her, Ms. Liz hereby files this action seeking redress for and the recovery of damages arising from the Foundation's unlawful retaliatory conduct in response to her protected whistleblower activities, in violation of Section 7623 of the Taxpayer First Act of 2019, 26 U.S.C. § 7623(d) (the "Taxpayer First Act"), the New York Labor Law ("NYLL") § 740, and the New York Not-For-Profit Corporation Whistleblower Protection Law ("NPCL") § 715-b .

## JURISDICTION AND VENUE

22.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves a federal question regarding Defendant's unlawful retaliation against Plaintiff in violation of Section 7623 of the Taxpayer First Act of 2019, 26 U.S.C. § 7623(d).  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

23.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of New York because a substantial part of the events or omissions giving rise to this action occurred in this district.

## ADMINISTRATIVE PREREQUISITES

24.     On June 10, 2020, Plaintiff filed a complaint with the Occupational Safety and Health Administration ("OSHA") of the U.S. Department of Labor, alleging violations of the Taxpayer First Act.

25.     The Secretary of Labor has not issued a final decision within 180 days of the filing of Plaintiff's complaint with OSHA.  Accordingly, Plaintiff is entitled to seek *de novo* review of her complaint filed with OSHA from this Court.

26.     Pursuant to NYLL § 215(2)(b), contemporaneously with the commencement of this action, Plaintiff will serve a copy of this Complaint upon the Office of the New York Attorney General, providing notice of the claims set forth in this action.

27.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

28.     Plaintiff Lourdes Liz is the former Director of Digital and Social Media of the Foundation for a Smoke-Free World.  At all relevant times, Plaintiff was an "employee" under

all relevant or applicable statutes.  Ms. Liz is an adult resident of New York.

29.     Defendant Foundation for a Smoke-Free World is presently classified as an IRC

501(c)(3) not-for-profit corporation, headquartered in New York, New York with its principal

place of business located at 575 Fifth Avenue, New York, New York, 10017.  At all relevant

times, the Foundation was an "employer" or "not-for-profit corporation" under all relevant or

applicable statutes.

## FACTUAL ALLEGATIONS

### I.     MS. LIZ'S PROFESSIONAL BACKGROUND

30.     Ms. Liz is an experienced marketing and communications director with expertise

in social media and digital promotion.  She holds an MBA degree from the Kellogg Graduate

School of Management at Northwestern University

31.     Before she joined the Foundation, Ms. Liz served as a Senior Marketing Manager

at HBO, Vice President of Marketing at Macy's, and Vice President of Program Strategy at the

Style Network (part of Comcast Entertainment Group).

32.     Ms. Liz also had relevant experience in the start-up space as a founding member

of Fútbol Mundial, the country's number one soccer publication, where she helped the

organization launch and develop branded content packages for clients that included Sports

Illustrated, ESPN, and Major League Soccer.

33.     Immediately before joining the Foundation, Ms. Liz worked in the non-profit

sector in high-level strategic positions at two notable non-profit organizations – the Leukemia

and Lymphoma Society and the Executive Alliance for Boys and Men of Color.

### II.    MS. LIZ'S ROLE AT THE FOUNDATION

34.     In February 2018, Ms. Liz joined the Foundation as its Director, Digital and

Social Media, to oversee its digital marketing communications strategies and functions.

35.     The Foundation's stated mission is to help eradicate the consumption of tobacco and smoking throughout the world.  This was a cause that Ms. Liz enthusiastically supported.

36.     When she was hired, Ms. Liz's areas of responsibilities included managing the strategy, implementation, and execution of all digital activities for the Foundation's website, social channels, and other digital channels.  This specifically included:

- Managing digital agency relationships;

- Managing digital media, including sponsored posts, advertorials, display ads, paid newsletters, and Google AdWords;

- Collaborating with key Foundation executives and departments to develop content and messaging;

- Working directly with Derek Yach, President of the Foundation, on social media messaging;

- Managing the analytical information for all of the Foundation's digital platforms; and

- Working with others within the organization on audience insight strategy presentations.

37.     Ms. Liz's notable accomplishments during her tenure at the Foundation included her efforts at successfully expanding and significantly enhancing the Foundation's website, taking it from being just a webpage to being a true, full website and portal that explained the Foundation's mission, and spotlighted requests for proposals ("RFP's"), blogs, research reports, media, community engagement, key documents, videos, and animated assets.

38.     Ms. Liz also was able to initiate and lead the creation and implementation of a Google AdWords strategy (crucial to any online strategy and public relations initiative) and the foreign language translation of the Foundation's website.  Mr. Yach deemed these two projects to be of highly critical importance to the Foundation.

III.    **MS. LIZ COMPLAINS TO NUMEROUS FOUNDATION SUPERVISORS ABOUT ITS APPARENT FRAUDULENT DESIGNATION AS A TAX-EXEMPT NON-PROFIT ORGANIZATION, AS WELL AS ITS APPARENT PRO-TEENAGE AND ADOLESCENT VAPING MESSAGE THAT CONSTITUTED A THREAT TO THE PUBLIC HEALTH, AND IS SUBJECTED TO A CAMPAIGN OF UNLAWFUL RETALIATION, CULMINATING IN HER FIRING**

A.    **The Foundation Misappropriates Its Tax-Exempt, Non-Profit Status While Acting as a Front for the Tobacco Industry, and Promotes a Pro-Teenage and Adolescent Vaping Message that is Harmful to the Public Health**

39.    The Foundation is an IRC Section 501(c)(3) tax-exempt, non-profit charitable organization.  Organizations that are classified as 501(c)(3) non-profit organizations by the IRS are exempt from federal taxes.  To be tax-exempt, the organization must operate solely for the charitable purpose for which it was established.

40.    The Foundation's Certificate of Incorporation, for example, states that its purpose is "to support independent scientific research free from the influence of any commercial entity that may be affected by the research outcome" in furtherance of its purported mission and goal of eradicating cigarette smoking throughout the world.

41.    The Foundation claims that it operates entirely independent from the tobacco industry.  However, the Foundation actually works to advance PMI's and Altria's goals, and not the Foundation's publicly stated mission.  PMI and Altria also use the Foundation as a conduit to engage in activities, such as advertising, in which PMI and Altria are restricted from participating.

42.    The Foundation remains financially funded exclusively by PMI, an American multinational cigarette and tobacco manufacturing company with products sold in over 180 countries – the most recognized of which is Marlboro.

43.    Until it was spun-off in 2008, PMI was an operating company of Altria.  Altria explained the basis for the spin-off as to allow PMI to have more "freedom," *i.e.* leeway outside

the responsibilities and standards of American corporate ownership *vis-à-vis* potential litigation and legislative restrictions, to "pursue sales growth in emerging markets," while Altria focused on the American domestic market.[1]

44.     Altria is the world's largest producer and marketer of tobacco, cigarettes, and related products, and a very large investor in the e-cigarette industry, including in JUUL.  Altria paid $13 billion for a 35% ownership share in JUUL.  According to recent Nielson data, JUUL accounts for nearly 60% of the market share in the U.S. e-cigarette market.[2]

45.     PMI has contributed and has agreed to continue contributing **$80 million per year** to the Foundation, starting in 2018.  Naturally, all of this money is excluded from taxation by the federal government due to the Foundation's current tax-exempt status.

46.     This financial support alone, of course, does not mean that the Foundation could not act independently in furtherance of its mission.  In fact, despite initial misgivings about her job at the Foundation, Ms. Liz accepted the position after being assured of the Foundation's independence.  The reality, however, as Ms. Liz quickly realized, is that the Foundation was and remains deeply intertwined and operates concurrently with PMI and Altria.

47.     These deep links, and even outright operations in concert, directly undermine the Foundation's tax-exempt, non-profit status.

48.     Just a few weeks into her role at the Foundation, in or around late February or early March 2018, Ms. Liz was shocked to learn that Mr. Yach, in conjunction with the

---

[1]     See Altria to spin off Philip Morris International: Company seeks to insulate cigarette business from U.S. litigation, Associated Press, August 29, 2007, accessible at http://www.nbcnews.com/id/20494757#.XtqhTshKiUk.

[2]     See Juul's e-cigarette market share continued to decline in December, by Richard Craver, January 10, 2020, accessible at https://www.journalnow.com/business/juuls-e-cigarette-market-share-continued-to-decline-in-december/article_d2e6925f-9350-5b6f-8138-e93b8cb328c3.html.

advertising firm Ogilvy, had proposed an advertising concept that used Instagram influencers and personalities who performed vaping and e-cigarette-related tricks (such as blowing circular "vape" bubbles after inhaling from an e-cigarette).

49.     This proposed advertising seemed clearly targeted at teenagers and adolescents and promoted a pro-vaping, and therefore pro-PMI and Altria, message, pushing the narrative that vaping was somehow a healthier alternative to smoking cigarettes.

50.     However, it has been widely reported that e-cigarettes have a very high level of nicotine, and are themselves a highly addictive and harmful drug.  E-cigarette usage, particularly among teenagers and adolescents, may lead or contribute to long-term nicotine addiction, which indisputably has a tremendously destructive impact on one's health and well-being (and, notably, also often is a precursor and leads to cigarette use).

51.     Indeed, many countries have either taken measures to severely curtail or even outright ban the use and availability of e-cigarettes and vaping products due to their detrimental impact on public health and well-being

52.     Ms. Liz patently disagreed with the Foundation's obvious and egregious exploitation of its non-profit, tax-exempt status and engagement in a complete divergence from the Foundation's stated purpose and mission, not to mention promotion of teenage and adolescent vaping which would have harmful effects on the public health.

53.     Ms. Liz, along with her supervisor and colleague Mica Wilson, Vice President of Marketing and Communications, complained to Tom Harding, the Foundation's Chief Operating Officer, about how the Foundation's proposed advertising campaign's use of Instagram influencers doing vaping tricks would unquestionably promote the consumption of e-cigarettes among teenagers and adolescents.  Ms. Liz made it clear that this would have a harmful impact

on public health and safety, particularly among young people, and was directly counter to the Foundation's publicly professed non-profit mission.

54.     The Foundation ultimately did not move forward with this proposed promotional campaign.

55.     Right around this time, however, Mr. Yach expressed, in no uncertain terms, his lack of concern about teenage vaping and e-cigarette consumption, which he argued was somehow safer than smoking.  Mr. Yach dismissed the addictive nature of the nicotine present in e-cigarettes, describing it instead as a mere "dependency," such as what someone can develop for caffeine.  Mr. Yach chose to ignore or dismiss the far higher level of nicotine present in e-cigarettes than what even is found in traditional tobacco cigarettes.

56.     Indeed, throughout Ms. Liz's tenure at the Foundation, the Foundation actively and consistently worked to push the message that vaping is a preferred, healthier alternative to smoking cigarettes.  This is a claim based not on unbiased, independent, scientifically proven research, but in PMI's and Altria's self-interest in promoting vaping products, particularly among young people.

57.     Notably, in spring 2018, Ms. Liz noticed that PMI had published a sustainability report documenting its efforts in Malawi aimed at encouraging the diversification of crops beyond tobacco, such as maize and soybeans.  This report *completely mirrored and sounded identical* to the Foundation's own "Agricultural Transformation Initiative."  This was a blatant example of the Foundation's collusion with the tobacco industry, in contravention of its purportedly independent, non-profit tax-exempt status.

58.     This clear synergy with and piggybacking on the messaging of a private company (indeed, one that bankrolls the Foundation) was blatantly contrary to the Foundation's public

representation that it was entirely independent and free of influence from PMI, and therefore could legally enjoy tax-exempt status.

59.     Ms. Liz raised her concerns regarding PMI and the Foundation making these efforts in tandem to Mr. Harding, as well as to her supervisor, Ms. Wilson.

60.     In the summer of 2018, Ms. Liz likewise raised concerns to Mr. Harding about why the Foundation was sponsoring the Conrad Challenge, run by the Conrad Foundation, which is an organization that supports a children's STEM-based education initiative, in connection with smoke-free challenges in certain target markets.  This event sponsorship, which seemed to target teenagers and adolescents, also appeared misdirected based on the Foundation's mission.

61.     Specifically, Ms. Liz was particularly alarmed to learn that the Foundation planned to fly the United States-based Conrad Challenge contest winners to Catania, Italy to visit the Foundation's Centre of Excellence there.  The Centre of Excellence's Founder and Director, Riccardo Polosa, had previously accepted a **€1 million grant from PMI to investigate PMI's heated tobacco products**.

62.     Ms. Liz again objected to what appeared to be the Foundation's attempt to further align itself and its messaging with PMI by propagating a pro-vaping message aimed at teens under the thin pretext of a "harm reduction" discussion.  Indeed, Ms. Wilson and Heather Majewski, Vice President of Shared Initiatives, shared the same or similar concerns with Mr. Harding.

63.     In late August 2018, it became even more abundantly clear to Ms. Liz that the ostensibly non-profit Foundation was not, in fact, operating independently from its financial backer, PMI, and commercial, for-profit interests.  Instead, the Foundation clearly was working hand-in-hand with PMI and Altria, business partners in the Marlboro, IQOS US business.

64.     Specifically, in an email to Ms. Liz, Mr. Yach stated, "Note that in our Altria meet[ing,] they stressed the high value of the poll and our efforts to correct the misperceptions – suggesting we can go even further with Ogilvy."  Mr. Yach was referring to a meeting he had with representatives from Altria in which Altria expressed that it saw value in the Foundation's Global State of Smoking Survey (he referred to it as the "poll") and the Foundation's efforts to downplay the harmfulness of nicotine (this is what Mr. Yach meant by "correct the misperceptions" – referring to a "misperception" that nicotine dependence is harmful).

65.     In addition, Altria wanted the Foundation's advertising agency, Ogilvy, to push these efforts further.

66.     Ms. Liz was deeply troubled by Mr. Yach's email.  His words ran directly counter to the Foundation's Pledge Agreement and Certificate of Incorporation, which state that the Foundation is independent from the tobacco industry.

67.     This pretense was now apparently being dropped altogether, at least behind closed doors.  Ms. Liz realized that this coordination and collusion between the Foundation and key players in the tobacco industry, such as Altria, were the reasons that Mr. Yach refused to take a strong anti-teen-vaping stance.

68.     Ms. Liz discussed her serious concerns about the Foundation's fraudulent activities and collusion or conflicts of interests *vis-à-vis* its ties with Big Tobacco corporations with her manager, Ms. Wilson, and with Ramla Benmaamar, Director of Scientific Communications, who appeared to share Ms. Liz's concerns.  Ms. Liz also brought these issues up to Mr. Harding, who downplayed her concerns.

69.     Mr. Yach's email was alarming not only because it confirmed that he, the Foundation's President, was holding strategy sessions with the tobacco industry, but that he also

was willing to take the tobacco industry's direction about the Foundation's own efforts, spending, and messaging. This was unquestionably violative of the Foundation's legal obligations as a 501(c)(3) tax-exempt organization.

70.     In particular, Mr. Yach's characterization of the findings of the Foundation's Global Survey as clearing up what he characterized as "misperceptions" pertaining to the harmfulness of nicotine transparently served the tobacco industry's interests, and ran directly contrary the goal of promoting (and in fact harmed) public health. The Foundation and Mr. Yach's position also was not one that "support[ed] *independent scientific research free from the influence of any commercial entity* that may be affected by the research outcome" (emphasis added).

71.     Moreover, the fact that the Foundation was willing to use the Ogilvy advertising agency to further this message in an environment in which tobacco companies like Altria must abide by strict regulations of and restrictions on advertising, also was of major concern to Ms. Liz and further demonstrated the Foundation's flouting of relevant regulations and laws.

72.     Quite simply, the Foundation and Mr. Yach were shamelessly looking to do Altria's bidding, and already seemed actively engaged in doing so by spreading its propaganda, despite the resulting risks and harm to public health, and its false representations that the Foundation was acting independently of corporate for-profit interests.

73.     Similarly, in September 2018, Mr. Yach shared an Altria press release with the Foundation's staff, and suggested that they *incorporate its talking points* into the Foundation's communications. This once again confirmed the close and improper relationship between the Foundation and Altria.

74.     Also, in September 2018, the Foundation announced its partnership in a Malawi-based grant relationship with the Palladium Group, three weeks after PMI had also announced it was working with the Palladium Group in Malawi in August 2018.

75.     As a result, in late October 2018, Ms. Liz again raised concerns, this time because the Foundation directed her to attend a teen marketing conference, as well as a meeting with an organization called DoSomething.org, a non-profit aimed at motivating youth to make positive social changes.

76.     Specifically, a red flag was raised by the fact that none of the Foundation's executives seemed to offer a rationale for why the Foundation should participate in these meetings, nor could they explain how attending would support the Foundation's stated goals and missions.

77.     Instead, it appeared that the goal of marketing and making the Foundation visible to teenagers was more in line with the interests of PMI and Altria, in promoting their purportedly "less harmful" smoking products, such as e-cigarettes.

78.     Likewise, PMI and the Foundation, at the direction of Mr. Yach, would also later *coordinate open letters* to the executive leadership of the World Health Organization in January 2019.  Notably, Ms. Liz and others disagreed with sending such an open letter to the WHO, but Mr. Yach forged ahead, seemingly at the direction of and/or in coordination with PMI.

### B.     The Foundation Retaliates against Ms. Liz For Her Protected Activities by Denying Her a Promotion for which She was In Line, and By Elevating a Far More Junior Employee over Her Who did Not Make Protected Complaints

79.     In the fall of 2018, Ms. Wilson left the Foundation, and a search for her replacement was underway.  Ms. Liz was a logical choice to take on Ms. Wilson's role, since (at that time) she was responsible for the majority of the department's projects.

80.     Ms. Liz expressed her interest in the role to Mr. Harding.

81.     However, it was clear that the Foundation wanted to promote Nicole Bradley, a Communications Manager who was junior to Ms. Liz, to the Vice President position.

82.     While Mr. Harding agreed to give Ms. Liz a courtesy interview, it was apparent that he wanted Ms. Bradley in that position, rather than either Ms. Liz or Ms. Benmaamar (both of whom were directors), because Ms. Bradley had not and would not challenge the Foundation's efforts to promote messages contrary to its mission and supposed independence from the tobacco industry (and impermissibly doing the bidding of PMI and Altria).

83.     Notably, Ms. Bradley had no digital marketing experience at the time, whereas Ms. Liz had over 20 years of relevant experience.

84.     In December 2018, Ms. Bradley was promoted to the Vice President role, leapfrogging Ms. Liz, who was now suddenly Ms. Bradley's direct report and subordinate.

85.     This was a blatant act of retaliation against Ms. Liz for complaining about the Foundation's actions demonstrating its lack of independence from, and efforts to disseminate, a pro-tobacco industry and pro-vaping message to teens, which were contrary to and undermined its obligations and requirements as a tax-exempt non-profit organization, and harmed the public's health.

**C.     Ms. Liz Is Sidelined and Ultimately Terminated in Retaliation for Her Protected Complaints**

86.     The Foundation added insult to injury when, after passing over Ms. Liz for a promotion in favor of a far less experienced and junior employee, it began to marginalize and sideline Ms. Liz, while subjecting her to baseless and retaliatory performance warnings and write-ups.

87.     It became obvious that Ms. Bradley had been given a mandate to sideline Ms. Liz and undercut her position at the Foundation in retaliation for having objected to the Foundation's inappropriate ties to PMI and Altria and their direct involvement in the affairs of the Foundation.

88.     As one example of such marginalization and retaliation, although Ms. Liz's title did not change, her role and responsibilities were steadily reduced so that her job effectively became more like that of a coordinator, rather than a director.

89.     Ms. Bradley also hoarded all relevant decision-making and strategy work, took over the management of all meetings, and took control of the internal and external relationships that touched Ms. Liz's role.

90.     Ms. Liz repeatedly asked for clarification of what her role was and would be going forward, but her requests were disregarded.

91.     As further retaliation, in February 2019, Ms. Bradley issued Ms. Liz a baseless "Performance Memorandum," supposedly to address Ms. Liz's "workplace demeanor." By that time, Ms. Liz already had been marginalized and subjected to retaliation for weeks after Ms. Bradley's improbable promotion.

92.     Ms. Liz objected to this "Performance Memorandum," and made it clear that she believed she was being purposely downgraded:

> Nicole, I completely disagree with what you have expressed in this email. Since December, you have consistently side step[ped] me in regards to my role within the team (social and digital marketing inclusive of the website). I have a tr[ai]l of emails to support this. You have completely ignored my advice which is based on more than 20 years of experience in this field.
>
> Hence, all we have been doing for the last few weeks is correcting unnecessary errors. You have completely excluded [me] from your discuss[ions] with Rampup regarding the transfer of website management / but you have chosen to include Phyllis. You draft a complete job description of a position that is technically reporting to [me] and ask for my input after the fact. And yes your actions

> have made [m]e feel very [un]comfortable and at times upset.  I frankly don't even know what my role is.
>
> I believe that in order to move forward we need to address all the underlying issues.

93.     Yet, nothing was done to address Ms. Liz's clearly stated concerns, much less to clarify her new, diminished role, and she continued to be marginalized for months.

94.     In October 2019, Ms. Bradley issued Ms. Liz another baseless "Performance Warning."  The criticisms lodged against Ms. Liz in that document also were without merit and/or completely overblown.

95.     The Foundation was making it clear that Ms. Liz was *persona non grata* after having objected, repeatedly, to its efforts to dupe the public and the IRS by acting as and claiming to be a non-profit, while promoting a pro-tobacco industry agenda and pushing a pro-vaping message at teens too young to even legally use the products, harming the public's health in the process.

96.     The efforts of the Foundation and Ms. Bradley also were a blatant, ill-advised attempt to create a pretextual paper trail in order to try to justify Ms. Liz's eventual termination.

97.     In November 2019, Ms. Liz, along with others from the Foundation, met with Alan Hilburg, a communications consultant and personal friend of Mr. Yach's, to work on a global communications strategy related to the WHO's Framework Convention on Tobacco Control, 9th Conference of the Parties ("COP9").  This event was set to take place in the Netherlands in November 2020.

98.     During the meeting, Mr. Hilburg advocated for the idea that the Foundation publicly advocate an "Under 18 – No Vaping" strategy in order to gain respect ahead of the conference.

99.     Ms. Liz challenged the underpinnings and implicit suggestions of this idea, and she noted that it indeed was already the policy (and often the law) of most, if not all, 50 states that no one under 18 should be vaping.  For this reason, such a message could confuse matters regarding the current teen vaping problem, because there should, of course, be no teenage vaping under 18 years of age (there should not be any question or controversy on the subject).

100.    Instead, Ms. Liz expressed her support for a "No Vaping Until 21" position, which would join the current congressional movement in favor of this stance and higher age limit, and bring the Foundation's policy into line with the alcohol laws of the United States.  Mr. Hilburg quickly dismissed Ms. Liz's views, and plowed ahead with his original idea.

101.    Notably, after this meeting, Ms. Liz was no longer included in discussions surrounding the COP9.  This was a particularly harsh punitive measure against her, given the overriding emphasis that Mr. Yach had placed on the event.

102.    This also was yet another reprisal and act of blatant retaliation against Ms. Liz for objecting to the Foundation's concerted efforts to do the tobacco industry's bidding by downplaying the dangers of and muddy the waters concerning teenage vaping.

103.    In early January 2020, Ms. Liz and Mr. Yach had a discussion about the FDA's policy on vaping.  Mr. Yach, once again, despite Ms. Liz's entreaties, refused to take a strong stance against teen vaping (which would, of course, conflict with PMI's and Altria's interests).

104.    Weeks later, on February 27, 2020, the Foundation terminated Ms. Liz's employment without substantive explanation, apart from a mention of the past performance write-up from October 2019  The Foundation had clearly given up on forcing Ms. Liz out of the organization by marginalizing her and scaling back her role, and had finally did what it thought

was necessary to silence her and keep her from interfering in its improper activities in violation

of its tax-exempt status and other related obligations once and for all.

## FIRST CAUSE OF ACTION
### (Retaliation in Violation of the Taxpayer First Act)

105.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the

preceding paragraphs as though fully set forth herein.

106.    As set forth above, Plaintiff made many protected complaints to Defendant

concerning, *inter alia*, false representations, violations of its non-profit/tax-exempt obligations,

tax fraud, and, in particular, Defendant's fraudulent misappropriation of tax-exempt, non-profit

status pursuant to IRC Section 501(c)(3).

107.    Defendant violated the Taxpayer First Act by taking adverse employment actions

against Plaintiff in retaliation for her protected complaints, including, but not limited to, passing

her over for a promotion and demoting her, marginalizing her and stripping her of her duties and

responsibilities, issuing baseless performance warnings and write-ups, and ultimately terminating

Plaintiff's employment.

108.    As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has

suffered, and will continue to suffer, severe economic/financial, mental and emotional hardship,

and injury, including the loss of compensation, damage to her reputation, physical and emotional

distress, reduced possibilities for equivalent future compensation, and other additional damages,

including interest, attorneys' fees, costs, and disbursements.

109.    Defendant's conduct was in violation of federal laws and regulations, namely the

Taxpayer First Act, entitling Plaintiff to an award of all applicable damages recoverable under

the law in an amount to be established at trial, plus interest, attorneys' fees, costs, and

disbursements.

110.    Defendant's unlawful retaliatory actions constitute malicious, willful, and wanton violations of the Taxpayer First Act, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Whistleblower Retaliation in Violation of NYLL § 740)

111.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

112.    As detailed above, Defendant subjected Plaintiff to multiple adverse employment actions because Plaintiff disclosed and/or objected to an activity, policy, or practice of Defendant that is in violation of a law, rule, or regulation that creates a substantial and specific danger to the public health or safety, including, but not limited to, promoting the vaping of tobacco products to teenagers and adolescents.

113.    As a direct and proximate result of Defendant's willful and unlawful conduct in violation of the NYLL, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of damages, to the greatest extent permitted by law.

## THIRD CAUSE OF ACTION
### (Retaliation in Violation of the NPCL Section 715-b)

114.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

115.    Defendant is a not-for-profit corporation operating in New York state that has twenty or more employees and has annual revenues of or more than one million dollars, with an obligation to adopt, implement, and comply with a whistleblower policy to protect from retaliation persons who report suspected improper conduct, including conduct that is illegal, fraudulent, or in violation of an adopted policy of the corporation.

116.    However, as described herein, as a result of the complaints raised by Plaintiff concerning improper conduct at the Foundation, the Foundation has unlawfully caused Plaintiff to suffer intimidation, harassment, discrimination, retaliation, and/or other adverse employment consequences, in violation of NPCL Section 715-b.

117.    As a direct and proximate result of the unlawful retaliatory conduct alleged herein committed by the Foundation in violation of the NPCL Section 715-b, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm, including, but not limited to, loss of past and future income, for which she is entitled to an award of monetary damages and other relief.

118.    As a direct and proximate result of the unlawful retaliatory conduct alleged herein committed by Defendant in violation of the NPCL Section 715-b, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

119.    Defendant's unlawful retaliatory actions constitute malicious, willful, and wanton violations of NPLC Section 715-b, for which Plaintiff is entitled to an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant for the following relief:

A.    A declaratory judgment that the actions, conduct, and practices of Defendant complained of herein violate the laws of the United States and the State of New York;

B.      An award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

C.      An award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

D.      An award of liquidated damages equal to the amount of Plaintiff's past and future lost wages;

E.      An award of punitive damages in an amount to be determined at trial;

F.      Prejudgment interest on all amounts due;

G.      Post-judgment interest as may be allowed by law;

H.      An award of Plaintiff's reasonable attorneys' fees and costs; and

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: January 13, 2021
      New York, New York                       Respectfully submitted,

                                      **WIGDOR LLP**

                                      By: _____
                                          Lawrence M. Pearson
                                          Tanvir H. Rahman

                                      85 Fifth Avenue
                                      New York, NY 10003
                                      Telephone: (212) 257-6800
                                      Facsimile: (212) 257-6845
                                      lpearson@wigdorlaw.com
                                      trahman@wigdorlaw.com

                                      *Counsel for Plaintiff*