**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- X

LOURDES LIZ,                                              :

                             :       Case No.: 21-cv-281 (ER)(JLC)

                Plaintiff,     :

                             :

      -against-          :       **AMENDED COMPLAINT**

                             :

FOUNDATION FOR A SMOKE-FREE   :       <u>**Jury Trial Demanded**</u>
WORLD, INC.

                             :

                  Defendant.   :

------------------------------------------------------------- X

Plaintiff Lourdes Liz ("Ms. Liz" or "Plaintiff"), by and through her attorneys, Wigdor

LLP, as and for her Amended Complaint against Defendant Foundation for a Smoke-Free World,

Inc. ("Defendant" or the "Foundation"), hereby alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      This action arises out of the Foundation for a Smoke-Free World, Inc.'s unlawful

retaliation against Plaintiff Lourdes Liz, which culminated in her termination.  The Foundation,

over the course of more than a year, engaged in intimidation and retaliation against Ms. Liz in

response to her repeated and steadfast objections to and complaints based on her reasonable

belief that the Foundation, through its hand-in-glove coordination with companies seeking to

promote vaping among teenagers, was violating its legal requirements and obligations as a tax-

exempt, non-profit organization.

2.      The Foundation's violations, to which Ms. Liz objected, included engaging in

activities designed to increase the profits of and do the bidding of for-profit corporations in the

tobacco industry, namely Phillip Morris International ("PMI") and its former parent company,

Altria Group, Inc. ("Altria"), in violation of its tax-exempt, non-profit status with the Internal

Revenue Service ("IRS").  Altria is the world's largest producer and marketer of tobacco,

cigarettes, and related products, and PMI's current partner in marketing and sales of IQOS, a heated tobacco and vape product manufacturer, in the United States.

3.     The Foundation tries to portray itself as an independent organization attempting to reduce the consumption of products produced by Big Tobacco.  This, however, is a mere smoke screen, and the Foundation has become well known as a tool of PMI and Altria, used to peddle their products (particularly vaping products) and push their message from behind a facade of seemingly respectable, supposedly independent science and public health research and policy. See, e.g., Philip Morris Money is Funding Pro-Vaping Virus Spin, by Tiffany Kary, April 17, 2020, accessible at https://www.bloomberg.com/news/articles/2020-04-17/philip-morris-money-is-funding-pro-vaping-coronavirus-spin; 10 Takeaways from The Foundation for a Smoke-Free World's 2019 Tax Return, accessible at https://exposetobacco.org/wp content/uploads/FSFW_2019_Tax_Return.pdf.

4.     Ms. Liz had the courage to question and object to the Foundation's improper communications with and heavy influence by PMI and Altria, and call it out as contrary to its mission as a non-profit that was supposedly seeking to foster a "smoke free world."  Ms. Liz reasonably believed that these links to tobacco corporations violated the Internal Revenue Code ("IRC") insofar as the Foundation continued to claim that it was an independent non-profit whose activities did not serve the private interests or private benefits of outside organizations more than immaterially, when in fact it was not.  Indeed, the Foundation is largely funded by PMI, making it all the more important to maintain true objectivity and keep PMI and Altria at arm's length in any strategy and marketing discussions.  If the Foundation is instead a marketing arm for Big Tobacco, its non-profit status is bogus because it would be serving the private interests and private benefits of Big Tobacco corporations, while failing to operate in accordance

with its stated exempt purposes. The Foundation would also be improperly reaping financial and other benefits (*e.g.*, marketing and an appearance of independence and objectivity) of being classified as a tax-exempt entity pursuant to section 501(c)(3) of the IRC.

5.      In addition, Ms. Liz made legally protected complaints about the Foundation's efforts to promote the use and/or downplay the health risks of e-cigarettes by teenagers and adolescents (who are not legally old enough to use such products in New York and many other states). The Foundation engaged in such activities under the pretext of "harm reduction," *i.e.*, purportedly pointing them towards "safer" alternatives to cigarette smoking. The Foundation did this despite the highly addictive nature of and dangerous levels of nicotine and other harmful ingredients in these products.

6.      Ms. Liz was shocked by how the Foundation was doing the bidding of PMI and Altria (a very large investor in the e-cigarette industry, including in JUUL Labs, Inc. ("JUUL")), and was furthering PMI's goal of creating a new generation of tobacco/nicotine users.

7.      For instance, just weeks into her employment, Ms. Liz learned that the Foundation's President, Derek Yach, in conjunction with the advertising firm Ogilvy, proposed an advertising concept that used Instagram influencers and personalities who performed vaping and e-cigarette related tricks (such as blowing circular "vape" bubbles after inhaling from an e-cigarette) – an advertising idea clearly targeted at teenagers and adolescents that promoted a pro-vaping, and therefore pro-PMI and Altria, message that vaping was a healthier alternative to smoking cigarettes.

8.      Ms. Liz vehemently disagreed with the Foundation's obvious and egregious exploitation of its non-profit, tax-exempt status and engagement in activities that diverged from

its stated purpose and mission, not to mention promotion of teenage and adolescent vaping which would have harmful effects on the public health.

9.      Further, in the summer of 2018, Ms. Liz complained about why the Foundation was sponsoring the Conrad Challenge, run by the Conrad Foundation, an organization that supports a children's STEM-based education initiative, in connection with smoke-free challenges in certain target markets.  This event sponsorship, which seemed to target teenagers and adolescents, also appeared misdirected based on the Foundation's mission.

10.     In particular, Ms. Liz was alarmed to learn that the Foundation planned to fly the United States-based Conrad Challenge contest winners to Catania, Italy to visit the Foundation's Centre of Excellence there, whose Founder and Director, Riccardo Polosa, had previously accepted a **€1 million grant from PMI to investigate PMI's heated tobacco products**.  It was clear to Ms. Liz that was yet another attempt by the Foundation to further align itself and its messaging with PMI by propagating a pro-vaping message aimed at teens and future leaders in the scientific community under the thin pretext of a "harm reduction" discussion.

11.     Similarly, in late August 2018, Ms. Liz received an email from Mr. Yach, where he referenced a meeting he had with representatives from Altria, in which Altria described as "high value" (i.e., very useful) a recent global poll that the Foundation had commissioned which found that people throughout the world fear the health risks and dangers of e-cigarettes, praised the Foundation's apparent efforts to downplay the harmfulness of these products (he characterized this as "efforts to correct misperceptions"), and urged the Foundation to further push these efforts through the advertising agency Ogilvy (an advertising company with known long-standing ties to Big Tobacco corporations).

12.     In particular, Ms. Liz was alarmed by the fact that Mr. Yach described the public concern about the health risks and safety of e-cigarettes depicted in the poll results as "misperceptions" that needed to be "correct[ed]" since by this time the Foundation, which had only been established about eight months earlier, had yet to conduct any research of its own, sponsor any research, or render any findings that suggested that e-cigarette use was anything but harmful and posed risks to a person's health. There was no basis for Mr. Yach, on behalf of Foundation, to conclude that the global poll's results depicted any "misperception" about the health effects of e-cigarettes apart from pursuing the agenda of Altria and PMI. It was obvious to Ms. Liz that Mr. Yach was merely repeating Altria's talking point about how its product, e-cigarettes, was not harmful, and that he had no qualms about leveraging the Foundation's publicly funded advertising and other resources to bolster Altria's interests.

13.     Mr. Yach's email not only confirmed that he, the Foundation's President, was holding strategy sessions with the Big Tobacco industry, but that he was willing to take and heed the tobacco industry's direction about the Foundation's own efforts, spending, and messaging, which was unquestionably violative of the Foundation's legal obligations as a 501(c)(3) tax-exempt organization.

14.     Then, in October 2018, Ms. Liz raised concerns when the Foundation, whose stated mission is to fund research, promote innovation, and support initiatives to accelerate progress in reducing harm and deaths from smoking worldwide, directed her to attend a teen marketing conference, as well as a meeting with an organization called DoSomething.org, whose purpose is to motivate youth to make positive social changes. In particular, Ms. Liz was troubled by the fact that none of the Foundation's executives seemed to offer a rationale for why the

Foundation should participate in these meetings, nor could they explain how attending would support the Foundation's stated goals and missions.

15. Rather, it appeared that the goal of marketing and making the Foundation and its pro-e-cigarette and vaping messaging, effectively promoting those products, visible to teenagers was more in line with the interests of PMI and Altria in promoting their purportedly "less harmful" smoking products, *i.e.*, e-cigarettes, to a new generation of potential nicotine users.

16. Subsequently, on the heels of this above-described protected activity, in the fall of 2018, after Ms. Liz's manager departed the Foundation, Ms. Liz was passed over for a promotion into her former manager's role – a role that Ms. Liz was more than qualified to assume – in favor of an employee who was more junior to her and far less qualified and experienced, but who had not spoken out against or objected to the Foundation's questionable relationship with and activities *vis-à-vis* Big Tobacco corporations. This was clearly an act of blatant retaliation against Ms. Liz for her repeated complaints about the Foundation's suspect conduct.

17. Over the next year plus, Ms. Liz was subjected to a sustained campaign of further retaliation, which included being systematically stripped of her duties and responsibilities, and being issued baseless performance warning and write-ups in order to create a paper trail to justify further adverse employment actions.

18. During this time, the Foundation made it clear that Ms. Liz was *persona non grata* for having complained, repeatedly, about its efforts to dupe the public and the IRS by acting as and claiming to be a non-profit, while promoting a pro-tobacco industry agenda and pushing a pro-vaping message at teens too young to even legally use the products, harming the public's health in the process.

19.     Then, in November 2019, Ms. Liz challenged the Foundation's plan to advocate for an "Under 18 – No Vaping" strategy (which was already the policy (and often the law) of most, if not all, 50 states) at an upcoming World Health Organization ("WHO") convention, and supported a "No Vaping Until 21" position instead.  Again it was clear that the Foundation was acting directly contrary to its stated tax-exempt purposes and mission, and acting in a manner and supporting a position that only benefitted Big Tobacco companies and their interest in attracting a new generation of nicotine users.  It did not appear that the focus was on "harm reduction" and getting kids not to use any such products (while discussing the differences between tobacco and other nicotine delivery vehicles), but rather to turn them towards e-cigarettes and vaping.  Not only were Ms. Liz's views quickly dismissed, but she was also abruptly excluded from further discussions surrounding the Foundation's activities at this WHO convention.  This was yet another act of blatant retaliation for objecting to the Foundation's concerted efforts to do the tobacco industry's bidding, including by downplaying the dangers of teenage vaping.

20.     Subsequently, in January 2020, Ms. Liz and Mr. Yach had a discussion about the Food and Drug Administration's ("FDA") policy on vaping, during which Mr. Yach, once again, despite Ms. Liz's entreaties, refused to take a strong stance against teen vaping (which would of course conflict with PMI's and Altria's interests).

21.     Weeks later, on February 27, 2020, the Foundation summarily terminated Ms. Liz's employment, clearly having given up on trying to force Ms. Liz out of the organization by marginalizing her and scaling back her role.  The Foundation finally did what it thought was necessary to silence her once and for all and keep her from interfering in its improper activities in violation of its tax-exempt status and other related obligations.

22.     As a result of the Foundation's campaign of unlawful retaliation against her, Ms. Liz hereby files this action seeking redress for and the recovery of damages arising from the Foundation's unlawful retaliatory conduct in response to her protected whistleblower activities, in violation of Section 7623 of the Taxpayer First Act of 2019, 26 U.S.C. § 7623(d) (the "Taxpayer First Act"), the New York Labor Law ("NYLL") § 740, and the New York Not-For-Profit Corporation Whistleblower Protection Law ("NPCL") § 715-b .

## JURISDICTION AND VENUE

23.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves a federal question regarding Defendant's unlawful retaliation against Plaintiff in violation of Section 7623 of the Taxpayer First Act of 2019, 26 U.S.C. § 7623(d).  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

24.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of New York because a substantial part of the events or omissions giving rise to this action occurred in this district.

## ADMINISTRATIVE PREREQUISITES

25.     On June 10, 2020, Plaintiff filed a complaint with the Occupational Safety and Health Administration ("OSHA") of the U.S. Department of Labor, alleging violations of the Taxpayer First Act.

26.     The Secretary of Labor has not issued a final decision within 180 days of the filing of Plaintiff's complaint with OSHA.  Accordingly, Plaintiff is entitled to seek *de novo* review of her complaint filed with OSHA from this Court.

27.     Pursuant to NYLL § 215(2)(b), contemporaneously with the commencement of this action, Plaintiff served a copy of her Complaint upon the Office of the New York Attorney General, providing notice of the claims set forth in this action.

28.     Any and all other prerequisites to the filing of this suit have been met.

**PARTIES**

29.     Plaintiff Lourdes Liz is the former Director of Digital and Social Media of the Foundation for a Smoke-Free World.  At all relevant times, Plaintiff was an "employee" under all relevant or applicable statutes.  Ms. Liz is an adult resident of New York.

30.     Defendant Foundation for a Smoke-Free World is presently classified as an IRC 501(c)(3) not-for-profit corporation, headquartered in New York, New York with its principal place of business located at 575 Fifth Avenue, New York, New York, 10017.  At all relevant times, the Foundation was an "employer" or "not-for-profit corporation" under all relevant or applicable statutes.

**FACTUAL ALLEGATIONS**

## I.      MS. LIZ'S PROFESSIONAL BACKGROUND

31.     Ms. Liz is an experienced marketing and communications director with expertise in social media and digital promotion.  She holds an MBA degree from the Kellogg Graduate School of Management at Northwestern University

32.     Before she joined the Foundation, Ms. Liz served as a Senior Marketing Manager at HBO, Vice President of Marketing at Macy's, and Vice President of Program Strategy at the Style Network (part of Comcast Entertainment Group).

33.     Ms. Liz also had relevant experience in the start-up space as a founding member of Fútbol Mundial, the country's number one soccer publication, where she helped the

organization launch and develop branded content packages for clients that included Sports Illustrated, ESPN, and Major League Soccer.

34.     Immediately before joining the Foundation, Ms. Liz worked in the non-profit sector in high-level strategic positions at two notable non-profit organizations – the Leukemia and Lymphoma Society and the Executive Alliance for Boys and Men of Color.

## II.     MS. LIZ'S ROLE AT THE FOUNDATION

35.     In February 2018, Ms. Liz joined the Foundation as its Director, Digital and Social Media, to oversee its digital marketing communications strategies and functions.

36.     The Foundation's stated mission is to help eradicate the consumption of tobacco and smoking throughout the world.  This was a cause that Ms. Liz enthusiastically supported.

37.     Furthermore, in its audited financial statements, the Foundation asserts that it is organized to fund research, promote innovation, and support collaborative initiatives to accelerate progress in reducing harm and deaths from smoking worldwide.[1]

38.     Likewise, in its Certificate of Incorporation, the Foundation represents that it is organized and operates exclusively for charitable, scientific, and educational purposes pursuant to IRC Section 501(c)(3), including supporting independent research free from the influence of any commercial entity that may be affected by the research outcome.  In furtherance thereof, the Foundation represents that it will only use its assets and income therefrom to, among other things: (i) make grants to academic, health-related, research and science centers and institutions and other collaborating centers and institutions, and to scientific and health-related experts, to support research and projects regarding alternatives to cigarettes and other combustible tobacco

---

[1]     https://www.smokefreeworld.org/wp-content/uploads/2019/06/fsfw_2018_audited_financial_statements.pdf at p. 6.

products and how to best achieve a smoke-free world and advance the field of tobacco harm reduction; (ii) fund global research initiatives and publish reports regarding, among other things, the attitudes and opinions of the general public towards tobacco harm reduction; (iii) fund scientific verification studies to assess the impact of smoke-free and reduced risk products on public health outcomes and how such products affect the general population; (iv) inform the general public regarding the activities of the tobacco industry, other commercial entities, and other stakeholders which may have an impact, positive or negative, on achieving a smoke-free world and advancing the field of tobacco harm reduction; (v) research the effect of the reduced demand for leaf tobacco on farmers and other stakeholders and explore and promote sustainable agricultural and nutritional alternatives for tobacco farmers, tobacco land, and other stakeholders; and (vi) conduct global conferences, forums, panels, and similar programs to focus on the evolving science regarding alternatives to cigarettes and other combustible tobacco products and how to best realize a smoke free world.[2]

39.     Moreover, in its corporate bylaws, the Foundation represents that its goal is to promote and support significant scientific research that advances the field of tobacco harm reduction and reduces the public health burden of smoking-related diseases, and that its research program is guided by experienced researchers, scientists, and policy experts in accordance with the Foundation's objectives and purposes.[3]  Its goal is not supposed to be to increase use of e-cigarettes and vaping devices by teens and kids.

---

[2]     https://www.smokefreeworld.org/wp-content/uploads/2020/10/Amended-and-Restated-Pledge-Agreement-28Sept2020.pdf at p. 11.

[3]     Id.

40.     When she was hired, Ms. Liz's areas of responsibilities included managing the strategy, implementation, and execution of all digital activities for the Foundation's website, social channels, and other digital channels.  This specifically included:

- Managing digital agency relationships;

- Managing digital media, including sponsored posts, advertorials, display ads, paid newsletters, and Google AdWords;

- Collaborating with key Foundation executives and departments to develop content and messaging;

- Working directly with Derek Yach, President of the Foundation, on social media messaging;

- Managing the analytical information for all of the Foundation's digital platforms; and

- Working with others within the organization on audience insight strategy presentations.

41.     Ms. Liz's notable accomplishments during her tenure at the Foundation included her efforts at successfully expanding and significantly enhancing the Foundation's website, taking it from being just a webpage to being a true, full website and portal that explained the Foundation's mission, and spotlighted requests for proposals ("RFPs"), blogs, research reports, media, community engagement, key documents, videos, and animated assets.

42.     Ms. Liz also was able to initiate and lead the creation and implementation of a Google AdWords strategy (crucial to any online strategy and public relations initiative) and the foreign language translation of the Foundation's website.  Mr. Yach deemed these two projects to be of highly critical importance to the Foundation.

**III.    MS. LIZ COMPLAINS TO NUMEROUS FOUNDATION SUPERVISORS ABOUT ITS APPARENT FRAUDULENT DESIGNATION AS A TAX-EXEMPT NON-PROFIT ORGANIZATION, AS WELL AS ITS APPARENT PRO-TEENAGE AND ADOLESCENT VAPING MESSAGE THAT CONSTITUTED A THREAT TO THE PUBLIC HEALTH, AND IS SUBJECTED TO A CAMPAIGN OF UNLAWFUL RETALIATION, CULMINATING IN HER FIRING**

**A.    The Foundation Misappropriates Its Tax-Exempt, Non-Profit Status While Acting as a Front for the Tobacco Industry, and Promotes a Pro-Teenage and Adolescent Vaping Message that is Harmful to the Public Health**

43.    The Foundation is an IRC Section 501(c)(3) tax-exempt, non-profit charitable organization.  Organizations that are classified as 501(c)(3) non-profit organizations by the IRS are exempt from federal income taxes.  To be tax-exempt, the organization must operate solely for the charitable purpose for which it was established.  The exempt purposes set forth in Section 501(c)(3) include, among other things, charitable, educational, and scientific goals, while the term "charitable" is used in its generally accepted legal sense and includes, among other things, advancement of education or science.[4]

44.    An IRC Section 501(c)(3) organization can maintain its tax-exempt status so long as it follows the rules affecting the following six areas: private benefit/inurement, lobbying, political campaign activity, unrelated business income (UBI), annual reporting obligation, and operation in accordance with stated exempt purpose(s).  Relevant to the claims at issue in this action, a 501(c)(3) organization's activities must not serve the private interests, or private benefit, of any individual or organization more than insubstantially.  In addition, an organization must pursue the exempt activities it promised in its IRS application for tax exemption, and cannot deviate from its original purposes without notifying the IRS.[5]

---

[4]    https://www.irs.gov/charities-non-profits/charitable-organizations/exempt-purposes-internal-revenue-code-section-501c3.

[5]    Id.

45.     The Foundation's Certificate of Incorporation, for example, states that its purpose

is "to support independent scientific research free from the influence of any commercial entity

that may be affected by the research outcome" in furtherance of its purported mission and goal of

eradicating cigarette smoking throughout the world.

46.     The Foundation claims that it operates entirely independent from the tobacco

industry.  However, in contravention of its non-profit, tax-exempt status, the Foundation actually

works to advance PMI's and Altria's goals, and not the Foundation's publicly stated mission.

PMI and Altria also use the Foundation as a conduit to engage in activities, such as advertising,

in which PMI and Altria are restricted from participating.

47.     The Foundation remains financially funded exclusively by PMI, an American

multinational cigarette and tobacco manufacturing company with products sold in over 180

countries – the most recognized of which is Marlboro.

48.     Until it was spun-off in 2008, PMI was an operating company of Altria.  Altria

explained the basis for the spin-off as to allow PMI to have more "freedom," *i.e.* leeway outside

the responsibilities and standards of American corporate ownership *vis-à-vis* potential litigation

and legislative restrictions, to "pursue sales growth in emerging markets," while Altria focused

on the American domestic market.[6]

49.     Altria is the world's largest producer and marketer of tobacco, cigarettes, and

related products, and a very large investor in the e-cigarette industry, including in JUUL.  Altria

---

[6]     See Altria to spin off Philip Morris International: Company seeks to insulate cigarette
business from U.S. litigation, *Associated Press*, August 29, 2007, accessible at
http://www.nbcnews.com/id/20494757#.XtqhTshKiUk.

paid $13 billion for a 35% ownership share in JUUL. According to recent Nielson data, JUUL accounts for nearly 60% of the market share in the U.S. e-cigarette market.[7]

50.     PMI has contributed and has agreed to continue contributing **$80 million per year** to the Foundation, starting in 2018. Naturally, all of this money is excluded from taxation by the federal government due to the Foundation's current tax-exempt status.

51.     This financial support alone, of course, does not mean that the Foundation could not act independently in furtherance of its mission. In fact, despite initial misgivings about her job at the Foundation, Ms. Liz accepted the position after being assured of the Foundation's independence. The reality, however, as Ms. Liz quickly realized, is that the Foundation was and remains deeply intertwined and operates concurrently with PMI and Altria.

52.     These deep links, and even outright operations in concert, directly undermine the Foundation's tax-exempt, non-profit status.

53.     Just a few weeks into her role at the Foundation, in or around late February or early March 2018, Ms. Liz was shocked to learn that Mr. Yach, in conjunction with the advertising firm Ogilvy – an advertising firm with known and long-established ties with the Big Tobacco industry –, had proposed an advertising concept that used Instagram influencers and personalities who performed vaping and e-cigarette-related tricks (such as blowing circular "vape" bubbles after inhaling from an e-cigarette).

54.     This proposed advertising seemed, to Ms. Liz, to run directly counter to the Foundations stated mission and tax-exempt purpose. It did not appear that the focus was on "harm reduction" and getting kids not to use any such products (while discussing the differences

---

[7]     See Juul's e-cigarette market share continued to decline in December, by Richard Craver, January 10, 2020, accessible at https://www.journalnow.com/business/juuls-e-cigarette-market-share-continued-to-decline-in-december/article_d2e6925f-9350-5b6f-8138-e93b8cb328c3.html.

between tobacco and other nicotine delivery vehicles), but rather to turn them towards e-cigarettes and vaping. Rather, the advertising concept in question appeared to clearly target teenagers and adolescents and promote a pro-vaping, and therefore pro-PMI and Altria, message, pushing the narrative that vaping was somehow a healthier alternative to smoking cigarettes.

55.     However, it has been widely reported that e-cigarettes have a very high level of nicotine, and are themselves a highly addictive and harmful drug. E-cigarette usage, particularly among teenagers and adolescents, may lead or contribute to long-term nicotine addiction, which indisputably has a tremendously destructive impact on one's health and well-being (and, notably, also often is a precursor and leads to cigarette use).

56.     In fact, in 2019, that the CDC identified a spate of vaping-related illnesses that killed 68 people in the U.S.[8]

57.     More recently, in connection with the COVID-19 global pandemic, government officials, including New York City Mayor Bill DeBlasio, have publicly stated that vaping enhances the potential for serious health risks for individuals who acquire COVID-19, while the Cleveland Clinic has said that "aldehydes and other components found in vaping liquids can impair the immune function of cells found in the airway and lungs," and the Canadian Paediatric Society has said vaping may put young people at risk of increased risk of severe coronavirus infection.[9]

---

[8]     See Outbreak of Lung Injury Associated with the Use of E-Cigarette, or Vaping, Products, *Center for Disease Control and Prevention*, last reviewed on November 27, 2020, accessible at https://www.cdc.gov/tobacco/basic_information/e-cigarettes/severe-lung-disease.html.
[9]     See Smoking or vaping increases risks for those with coronavirus: NYC mayor, *Reuters*, accessible at https://www.reuters.com/article/us-health-coronavirus-usa-vaping/smoking-or-vaping-increases-risks-for-those-with-coronavirus-nyc-mayor-idUSKBN20V0Z0; Teens, Vaping and Coronavirus (COVID-19): Is There a Connection?, *Cleveland Clinic*, accessible at https://health.clevelandclinic.org/teens-vaping-and-coronavirus-is-there-a-connection/; COVID,

58.    Indeed, many countries have either taken measures to severely curtail or even outright ban the use and availability of e-cigarettes and vaping products due to their detrimental impact on public health and well-being.

59.    Ms. Liz patently disagreed with the Foundation's obvious and egregious exploitation of its non-profit, tax-exempt status and engagement in a complete divergence from the Foundation's stated purpose and mission, not to mention promotion of teenage and adolescent vaping which would have harmful effects on the public health.

60.    Ms. Liz, along with her supervisor and colleague Mica Wilson, Vice President of Marketing and Communications, complained to Tom Harding, the Foundation's Chief Operating Officer, about how the Foundation, in conjunction with Ogilvy, was attempting to engage in an advertising campaign that featured Instagram influencers doing vaping tricks to unquestionably promote the consumption of e-cigarettes among teenagers and adolescents, and how this ran contrary to the Foundation's stated non-profit, tax-exempt purpose, particularly by benefitting only Big Tobacco's interests.  Ms. Liz also made it clear that this advertising campaign promoting vaping, from a professed non-profit organization whose mission was to advance safe alternatives to tobacco usage, would have a harmful impact on public health and safety, particularly among young people, who would be misled into believing that vaping was harmless and safe.

61.    The Foundation ultimately did not move forward with this proposed promotional campaign.

_____

youth, and substance use: Critical messages for youth and families, *Canadian Paediatric Society*, accessible at https://www.cps.ca/en/blog-blogue/covid-youth-and-substance-use-critical-messages-for-youth-and-families.

62.     Right around this time, however, Mr. Yach expressed, in no uncertain terms, his lack of concern about teenage vaping and e-cigarette consumption, which he argued was somehow safer than smoking. Mr. Yach dismissed the addictive nature of the nicotine present in e-cigarettes, describing it instead as a mere "dependency," such as what someone can develop for caffeine. Mr. Yach chose to ignore or dismiss the far higher level of nicotine present in e-cigarettes than what even is found in traditional tobacco cigarettes.

63.     Indeed, throughout Ms. Liz's tenure at the Foundation, the Foundation actively and consistently worked to push the message that vaping is a preferred, healthier alternative to smoking cigarettes. This is a claim based not on unbiased, independent, scientifically proven research, but in PMI's and Altria's self-interest in promoting vaping products, particularly among young people.

64.     Notably, in spring 2018, Ms. Liz noticed that PMI had published a sustainability report documenting its efforts in Malawi, one of the world's largest producers of tobacco leaves and the world's most tobacco-dependent economy, aimed at encouraging the diversification of crops beyond tobacco, such as maize and soybeans. This report *completely mirrored and sounded identical* to the Foundation's own "Agricultural Transformation Initiative." This was no coincidence but a blatant example of the Foundation's collusion with the tobacco industry to align their messaging, in contravention of its purportedly independent, non-profit tax-exempt status.

65.     This clear synergy with and piggybacking on the messaging of a private company (indeed, one that bankrolls the Foundation) was blatantly contrary to the Foundation's public representation that it was entirely independent and free of influence from PMI, and therefore

could legally enjoy tax-exempt status because it was not serving the private interests or pursuing the private benefit of any other organization.

66.     Ms. Liz raised her concerns regarding PMI and the Foundation making these efforts in tandem with PMI to Mr. Harding, as well as to her supervisor, Ms. Wilson.

67.     Similarly, in the summer of 2018, Ms. Liz raised concerns to Mr. Harding about why the Foundation was sponsoring the Conrad Challenge, run by the Conrad Foundation, an organization that supports a children's STEM-based education initiative, in connection with smoke-free challenges in certain target markets. The Conrad Challenge is a global science and innovation competition for school children. It was only after the Foundation became a sponsor of the event that a special category called "Smoke Free World Challenge" was added to the competition – a category bearing the name and branding of the Foundation. The Foundation's event sponsorship, which seemed to target and market to teenagers and adolescents, had virtually no relation to the Foundation's stated non-profit tax-exempt mission.

68.     Specifically, Ms. Liz was particularly alarmed to learn that the Foundation planned to fly the United States-based Conrad Challenge contest winners, who would be chosen by Foundation employees acting as judges, to Catania, Italy to visit the Foundation's Centre of Excellence there. The Centre of Excellence's Founder and Director, Riccardo Polosa, had previously accepted a **€1 million grant from PMI to investigate PMI's heated tobacco products**. In other words, the Foundation sponsored a global children's science and innovation contest, created an award category that received entries from groups of science-minded children from all over the world, acted as judges and chose the winning groups, and then funneled them to its Centre of Excellence led by an individual who had been effectively sponsored by PMI to "study" PMI's products. Through this subterfuge, the Foundation, contrary to its non-profit tax-

exempt purpose, was blatantly engaging in activities that led to the promotion and marketing of vaping products to teenagers likely to be the world's future scientific leaders with respect to issues that Big Tobacco companies had an interest in influencing.

69.     Ms. Liz again objected to what appeared to be the Foundation's attempt to further align itself and its messaging with PMI by propagating a pro-vaping message aimed at teens under the thin pretext of a "harm reduction" discussion.  Indeed, Ms. Wilson and Heather Majewski, Vice President of Shared Initiatives, shared the same or similar concerns with Mr. Harding about how the Foundation was transforming the Conrad Challenge into a means of promoting e-cigarettes and pro-vaping messages to kids, including the concept that vaping was harmless and safe, to the next generation of scientists and scholars.

70.     In late August 2018, it became even more abundantly clear to Ms. Liz that the ostensibly non-profit Foundation was not, in fact, operating independently from its financial backer, PMI, and commercial, for-profit interests.  Instead, the Foundation clearly was working hand-in-hand with PMI and Altria, business partners in the Marlboro, IQOS US business.

71.     Specifically, in an email to Ms. Liz, Mr. Yach stated, "Note that in our Altria meet[ing,] they stressed the high value of the poll and our efforts to correct the misperceptions – suggesting we can go even further with Ogilvy."  Mr. Yach was referring to a meeting he had with representatives from Altria in which Altria expressed that it saw value in the Foundation's Global State of Smoking Survey (he referred to it as the "poll") and the Foundation's efforts to downplay the harmfulness of nicotine (this is what Mr. Yach meant by "correct the misperceptions" – referring to a "misperception" that nicotine dependence is harmful).

72.     The results of the Global Survey showed that people throughout the world feared the health risks and dangers of e-cigarettes.  Altria regarded this information about how people

regarded e-cigarettes as "high value," since it gave insight as to which areas of public perception the Foundation should work to overturn, which Mr. Yach characterized as "efforts to correct misperceptions." Mr. Yach made it clear that Altria wanted the Foundation to further push these "efforts to correct misperceptions" with the help of the Ogilvy advertising agency, whose services the Foundation, of course, paid for (using tax-exempt monies).

73. Ms. Liz was quite alarmed by the fact that Mr. Yach described the public's concern about the health risks and safety of e-cigarettes noted in the Global Survey as "misperceptions" needing "correct[ion]," particularly because by this time, the Foundation, established only about eight months earlier, had yet to conduct or commission *any* research of its own that even suggested that e-cigarette use was anything but harmful and posed grave risks to a person's health, and certainly not research that suggested that vaping was less harmful than cigarettes. In fact, the Foundation had only recently issued RFPs for scientific research regarding supposed "harm reduction" products in July of 2018, and had not even gotten any responses to the RFPs by then.

74. In other words, there was no basis for Mr. Yach, in his capacity as President of the Foundation, to conclude that the Global Survey's results depicted any "misperception" about the health effects of e-cigarettes. Rather, it was clear to Ms. Liz that Mr. Yach was merely repeating an Altria talking point about how e-cigarettes were not harmful, and that he had no reservations about leveraging the Foundation's publicly funded advertising and other resources to bolster *Altria's* interests, in contravention of its stated tax-exempt, non-profit purpose.

75. In addition, the fact that Altria wanted the Foundation's advertising agency, Ogilvy, to push these efforts at correcting "misperceptions" and make the public more comfortable with vaping (using the Foundation's tax-exempt funds and resources) was even

more disturbing to Ms. Liz given the strict restrictions and regulations related to the types of direct public advertising that tobacco companies are legally permitted to engage in.

76.     Ms. Liz was deeply troubled by Mr. Yach's email.  His words ran directly counter to the Foundation's Pledge Agreement and Certificate of Incorporation, which both state that the Foundation is independent from the tobacco industry.

77.     This pretense was now apparently being dropped altogether, at least behind closed doors.  Ms. Liz realized that this coordination and collusion between the Foundation and key players in the tobacco industry, such as Altria, were the reasons that Mr. Yach refused to take a strong anti-teen-vaping stance.

78.     Ms. Liz discussed her serious concerns about the Foundation's fraudulent activities and collusion or conflicts of interests *vis-à-vis* its ties with Big Tobacco corporations with her manager, Ms. Wilson, and with Ramla Benmaamar, Director of Scientific Communications, who appeared to share Ms. Liz's concerns.  Ms. Liz also brought these issues up to Mr. Harding, particularly her concerns that the Foundation was violating its promises of independence from the tobacco industry made in its Pledge Agreement and Certificate of Incorporation by colluding with PMI to fund PMI's marketing activities through the Foundation. Mr. Harding simply downplayed her concerns.

79.     Mr. Yach's email was alarming not only because it confirmed that he, the Foundation's President, was holding strategy sessions with the tobacco industry, but that he also was willing to take the tobacco industry's direction about the Foundation's own efforts, spending, and messaging.  This was unquestionably violative of the Foundation's legal obligations as a 501(c)(3) tax-exempt organization, as the Foundation was engaging in activities

that served to benefit and the interests of Big Tobacco companies, and which ran counter to its stated non-profit, tax-exempt charitable purposes.

80.     In particular, Mr. Yach's characterization of the findings of the Foundation's Global Survey as clearing up what he characterized as "misperceptions" pertaining to the harmfulness of nicotine transparently served the tobacco industry's interests, and ran directly contrary to the goal of promoting (and in fact harmed) public health.  The Foundation and Mr. Yach's position also was not one that "support[ed] *independent scientific research free from the influence of any commercial entity* that may be affected by the research outcome" (emphasis added).

81.     Moreover, the fact that the Foundation was willing to use the Ogilvy advertising agency to further this message in an environment in which tobacco companies like Altria must abide by strict regulations of and restrictions on advertising, also was of major concern to Ms. Liz and further demonstrated the Foundation's flouting of relevant regulations and laws.

82.     Quite simply, the Foundation and Mr. Yach were shamelessly looking to do Altria's bidding, and already seemed actively engaged in doing so by spreading its propaganda, despite the resulting risks and harm to public health, and its false representations that the Foundation was acting independently of corporate for-profit interests.

83.     Similarly, in September 2018, Mr. Yach shared an Altria press release with the Foundation's staff, and suggested that they *incorporate its talking points* into the Foundation's communications.  This once again confirmed the close and improper relationship between the Foundation and Altria.

84.     Also, in September 2018, the Foundation announced its partnership in a Malawi-based grant relationship with the Palladium Group, three weeks after PMI had also announced it was working with the Palladium Group in Malawi in August 2018.

85.     As a result, in late October 2018, Ms. Liz again raised concerns, this time because the Foundation directed her to attend a teen marketing conference, as well as a meeting with an organization called DoSomething.org, a non-profit aimed at motivating youth to make positive social changes.

86.     Specifically, a red flag was raised by the fact that none of the Foundation's executives to whom Ms. Liz complained – Mr. Harding, Mr. Yach and his Chief of Staff, Ms. Benmaamar, among others – seemed to offer *any* rationale for why the Foundation should participate in these meetings, nor could they explain how attending would support the Foundation's stated goals and missions.  Indeed, the Foundation's audience, as made clear in its mission and other publicly professed purposes, was the scientific and research community, and not teenagers to whom Altria and PMI could indirectly market their products *via* the Foundation's pro-vaping message, with the hope of cultivating Big Tobacco's next generation of nicotine users.

87.     Instead, it appeared that the goal of marketing and making the Foundation and its pro-e-cigarette messaging visible to teenagers was in line with the interests of PMI and Altria to promote their purportedly "less harmful" smoking products, such as e-cigarettes, to a new generation of potential nicotine users.

88.     Likewise, PMI and the Foundation, at the direction of Mr. Yach, would also later *coordinate open letters* to the executive leadership of the World Health Organization in January 2019.  Notably, Ms. Liz and others disagreed with sending such an open letter to the WHO, but

Mr. Yach forged ahead, seemingly at the direction of and/or in coordination with PMI.  Ms. Liz

was so upset by the obvious collusion between PMI and the Foundation that she complained to

Mr. Harding about how the Foundation was using its own resources to fund PMI's initiatives,

was wrongfully establishing synergy with PMI, and that this was not permitted because of the

Foundation's tax-exempt status, which this activity rendered invalid and/or unlawful.

> **B.** **The Foundation Retaliates against Ms. Liz For Her Protected Activities by Denying Her a Promotion for which She was In Line, and By Elevating a Far More Junior Employee over Her Who did Not Make Protected Complaints**

89.     In the fall of 2018, Ms. Wilson left the Foundation, on the heels of the numerous

complaints Ms. Liz raised about the Foundation's failure to remain independent from Big

Tobacco companies, as well as its blatant efforts to engage in activities that benefitted those

companies, which violated the Foundation's status as a non-profit tax-exempt organization and

ran contrary to its stated mission and purpose.  A search for her replacement was soon underway.

Ms. Liz was a logical choice to take on Ms. Wilson's role, since (at that time) she was

responsible for the majority of the department's projects.

90.     Ms. Liz expressed her interest in the role to Mr. Harding.

91.     However, it was clear that the Foundation wanted to promote Nicole Bradley, a

Communications Manager who was junior to Ms. Liz, to the Vice President position.

92.     While Mr. Harding agreed to give Ms. Liz a courtesy interview, it was apparent

that he wanted Ms. Bradley in that position, rather than either Ms. Liz or Ms. Benmaamar (both

of whom were directors), because Ms. Bradley had not and would not challenge the Foundation's

efforts to promote messages contrary to its mission and supposed independence from the tobacco

industry (and impermissibly doing the bidding of PMI and Altria).

93. Notably, Ms. Bradley had <u>no</u> digital marketing experience at the time, whereas Ms. Liz had over 20 years of relevant experience.

94. In December 2018, Ms. Bradley was promoted to the Vice President role, leapfrogging Ms. Liz, who was now suddenly Ms. Bradley's direct report and subordinate.

95. This was a blatant act of retaliation against Ms. Liz for complaining about the Foundation's actions demonstrating its lack of independence from, and efforts to disseminate, a pro-tobacco industry and pro-vaping message to teens, which were contrary to and undermined its obligations and requirements as a tax-exempt non-profit organization, and harmed the public's health.

**C.** **Ms. Liz Is Sidelined and Ultimately Terminated in Retaliation for Her Protected Complaints**

96. The Foundation added insult to injury when, after passing over Ms. Liz for a promotion in favor of a far less experienced and junior employee, it began to marginalize and sideline Ms. Liz, while subjecting her to baseless and retaliatory performance warnings and write-ups.

97. It became obvious that Ms. Bradley had been given a mandate to sideline Ms. Liz and undercut her position at the Foundation in retaliation for having objected to the Foundation's inappropriate ties to PMI and Altria and their direct involvement in the affairs of the Foundation.

98. As one example of such marginalization and retaliation, although Ms. Liz's title did not change, her role and responsibilities were steadily reduced so that her job effectively became more like that of a coordinator, rather than a director.

99. Ms. Bradley also hoarded all relevant decision-making and strategy work, took over the management of all meetings, and took control of the internal and external relationships that touched Ms. Liz's role.

100.     Ms. Liz repeatedly asked for clarification of what her role was and would be going forward, but her requests were disregarded.

101.     As further retaliation, in February 2019, Ms. Bradley issued Ms. Liz a baseless "Performance Memorandum," supposedly to address Ms. Liz's "workplace demeanor." By that time, Ms. Liz already had been marginalized and subjected to retaliation for weeks after Ms. Bradley's improbable promotion.

102.     Ms. Liz objected to this "Performance Memorandum," and made it clear that she believed she was being purposely downgraded:

> Nicole, I completely disagree with what you have expressed in this email. Since December, you have consistently side step[ped] me in regards to my role within the team (social and digital marketing inclusive of the website). I have a tr[ai]l of emails to support this. You have completely ignored my advice which is based on more than 20 years of experience in this field.

> Hence, all we have been doing for the last few weeks is correcting unnecessary errors. You have completely excluded [me] from your discuss[ions] with Rampup regarding the transfer of website management / but you have chosen to include Phyllis. You draft a complete job description of a position that is technically reporting to [me] and ask for my input after the fact. And yes your actions have made [m]e feel very [un]comfortable and at times upset. I frankly don't even know what my role is.

> I believe that in order to move forward we need to address all the underlying issues.

103.     Yet, nothing was done to address Ms. Liz's clearly stated concerns, much less to clarify her new, diminished role, and she continued to be marginalized for months.

104.     In October 2019, Ms. Bradley issued Ms. Liz another baseless "Performance Warning." The criticisms lodged against Ms. Liz in that document also were without merit and/or completely overblown.

105.     The Foundation was making it clear that Ms. Liz was *persona non grata* after having objected, repeatedly, to its efforts to dupe the public and the IRS by acting as and claiming to be a non-profit, while promoting a pro-tobacco industry agenda and pushing a pro-vaping message at teens too young to even legally use the products, harming the public's health in the process.

106.     The efforts of the Foundation and Ms. Bradley also were a blatant, ill-advised attempt to create a pretextual paper trail in order to try to justify Ms. Liz's eventual termination.

107.     In November 2019, Ms. Liz, along with others from the Foundation, met with Alan Hilburg, a communications consultant and personal friend of Mr. Yach's, to work on a global communications strategy related to the WHO's Framework Convention on Tobacco Control, 9th Conference of the Parties ("COP9").  This event was set to take place in the Netherlands in November 2020.

108.     During the meeting, Mr. Hilburg advocated for the idea that the Foundation publicly advocate an "Under 18 – No Vaping" strategy in order to gain respect ahead of the conference.

109.     Ms. Liz challenged the underpinnings and implicit suggestions of this idea, and she noted that it indeed was already the policy (and often the law) of most, if not all, 50 states that no one under 18 should be vaping.  For this reason, such a message could confuse matters regarding the current teen vaping problem, because there should, of course, be no teenage vaping under 18 years of age (there should not be any question or controversy on the subject).

110.     Instead, Ms. Liz expressed her support for a "No Vaping Until 21" position, which would join the current congressional movement in favor of this stance and higher age limit, and bring the Foundation's policy into line with the alcohol laws of the United States.  Mr.

Hilburg quickly dismissed Ms. Liz's views, and plowed ahead with his original idea. As a result, it again was clear that the Foundation's focus was not on "harm reduction" and getting kids not to use any such products (while discussing the differences between tobacco and other nicotine delivery vehicles), but rather to turn them towards e-cigarettes and vaping. It was clear that the Foundation was acting directly contrary to its stated tax-exempt purposes, and acting in a manner and supporting a position that only benefitted Big Tobacco companies and their interest in gaining new nicotine users.

111.    Notably, not only were Ms. Liz's views quickly dismissed after this meeting, but Ms. Liz was also no longer included in discussions surrounding the COP9. This was a particularly harsh punitive measure against her, given the overriding emphasis that Mr. Yach had placed on the event.

112.    This also was yet another reprisal and act of blatant retaliation against Ms. Liz for objecting to the Foundation's concerted efforts to do the tobacco industry's bidding by downplaying the dangers of and muddy the waters concerning teenage vaping.

113.    In early January 2020, Ms. Liz and Mr. Yach had a discussion about the FDA's policy on vaping. Mr. Yach, once again, despite Ms. Liz's entreaties, refused to take a strong stance against teen vaping (which would, of course, conflict with PMI's and Altria's interests).

114.    Weeks later, on February 27, 2020, the Foundation terminated Ms. Liz's employment without substantive explanation, apart from a mention of the past performance write-up from October 2019. The Foundation had clearly given up on forcing Ms. Liz out of the organization by marginalizing her and scaling back her role, and had finally did what it thought was necessary to silence her and keep her from interfering in its improper activities in violation of its tax-exempt status and other related obligations once and for all.

115. By this time, the Foundation either did not have or had only very recently rolled out a whistleblower policy aimed at protecting from retaliation persons who report suspected improper conduct, including conduct that is illegal, fraudulent, or in violation of an adopted policy of the organization.

116. In any event, regardless of whether such a policy may have been in effect, the Foundation was not complying with such policy given how it blatantly retaliated against Ms. Liz in response to her complaints concerning improper conduct, including conduct in violation of the tax code *vis-à-vis* the Foundation's non-profit, tax-exempt status, as well as its creation of a substantial and specific danger to public health or safety through the promotion of vaping of tobacco products to teenagers and adolescents – an activity widely regarded in the scientific and health community as having extremely harmful effects on one's health.

117. Through her termination, denial of promotion, the stripping of her responsibilities, and other unlawful employment actions, the Foundation has unlawfully caused Plaintiff to suffer intimidation, harassment, discrimination, retaliation, and/or other adverse employment actions and consequences.

## FIRST CAUSE OF ACTION
### (Retaliation in Violation of the Taxpayer First Act)

118. Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as though fully set forth herein.

119. As set forth above, Plaintiff made many protected complaints to Defendant concerning, *inter alia*, false representations, violations of its non-profit/tax-exempt obligations, tax fraud, and, in particular, Defendant's fraudulent misappropriation of tax-exempt, non-profit status pursuant to IRC Section 501(c)(3).

120. Defendant violated the Taxpayer First Act by taking adverse employment actions

against Plaintiff in retaliation for her protected complaints, including, but not limited to, passing her over for a promotion and demoting her, marginalizing her and stripping her of her duties and responsibilities, issuing baseless performance warnings and write-ups, and ultimately terminating Plaintiff's employment.

121.    As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered, and will continue to suffer, severe economic/financial, mental and emotional hardship, and injury, including the loss of compensation, damage to her reputation, physical and emotional distress, reduced possibilities for equivalent future compensation, and other additional damages, including interest, attorneys' fees, costs, and disbursements.

122.    Defendant's conduct was in violation of federal laws and regulations, namely the Taxpayer First Act, entitling Plaintiff to an award of all applicable damages recoverable under the law in an amount to be established at trial, plus interest, attorneys' fees, costs, and disbursements.

123.    Defendant's unlawful retaliatory actions constitute malicious, willful, and wanton violations of the Taxpayer First Act, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Whistleblower Retaliation in Violation of NYLL § 740)

124.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

125.    As detailed above, Defendant subjected Plaintiff to multiple adverse employment actions because Plaintiff disclosed and/or objected to an activity, policy, or practice of Defendant that is in violation of a law, rule, or regulation that creates a substantial and specific danger to the

public health or safety, including, but not limited to, promoting the vaping of tobacco products to teenagers and adolescents.

126.    As a direct and proximate result of Defendant's willful and unlawful conduct in violation of the NYLL, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of damages, to the greatest extent permitted by law.

**THIRD CAUSE OF ACTION**
**(Retaliation in Violation of the NPCL Section 715-b)**

127.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

128.    Defendant is a not-for-profit corporation operating in New York state that has twenty or more employees and has annual revenues of or more than one million dollars, with an obligation to adopt, implement, and comply with a whistleblower policy to protect from retaliation persons who report suspected improper conduct, including conduct that is illegal, fraudulent, or in violation of an adopted policy of the corporation.

129.    However, as described herein, as a result of the complaints raised by Plaintiff concerning improper conduct at the Foundation, the Foundation has unlawfully caused Plaintiff to suffer intimidation, harassment, discrimination, retaliation, and/or other adverse employment consequences, in violation of NPCL Section 715-b.

130.    As a direct and proximate result of the unlawful retaliatory conduct alleged herein committed by the Foundation in violation of the NPCL Section 715-b, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm, including, but not limited to, loss of past and future income, for which she is entitled to an award of monetary damages and other relief.

131.     As a direct and proximate result of the unlawful retaliatory conduct alleged herein committed by Defendant in violation of the NPCL Section 715-b, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

132.     Defendant's unlawful retaliatory actions constitute malicious, willful, and wanton violations of NPLC Section 715-b, for which Plaintiff is entitled to an award of punitive damages.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant for the following relief:

A.     A declaratory judgment that the actions, conduct, and practices of Defendant complained of herein violate the laws of the United States and the State of New York;

B.     An award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

C.     An award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

D.     An award of liquidated damages equal to the amount of Plaintiff's past and future lost wages;

E.     An award of punitive damages in an amount to be determined at trial;

F.     Prejudgment interest on all amounts due;

G.     Post-judgment interest as may be allowed by law;

H.     An award of Plaintiff's reasonable attorneys' fees and costs; and

I.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: May 26, 2021
     New York, New York                          Respectfully submitted,

                                            **WIGDOR LLP**

                                            By: _____
                                                Lawrence M. Pearson
                                                Tanvir H. Rahman

                                          85 Fifth Avenue
                                          New York, NY 10003
                                          Telephone: (212) 257-6800
                                          Facsimile: (212) 257-6845
                                          lpearson@wigdorlaw.com
                                          trahman@wigdorlaw.com

                                          *Counsel for Plaintiff*